# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **LARA CARLSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **2:16-cv-00096-JDL** |
| | ) | |
| **THE UNIVERSITY OF NEW** | ) | |
| **ENGLAND,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Lara Carlson has filed suit against her employer, the University of New England (UNE), alleging that she was subject to unlawful retaliation, in violation of Title VII of the Civil Rights Act and the Maine Human Rights Act, for having reported acts of sexual harassment by a supervisor. ECF No. 1-1. UNE moves for summary judgment on all claims against it. ECF No. 35. For the reasons below, UNE's motion is granted.

## 1. FACTUAL BACKGROUND

Carlson was hired by UNE as a tenure-track associate professor in the Exercise and Sport Performance (ESP) Department in 2009. She specializes in the field of exercise physiology and has primarily taught exercise science classes, including Exercise Physiology and Environmental Physiology while at UNE. In 2011, Paul Visich became the chair of the ESP Department, and Carlson's direct supervisor. Carlson alleges that Visich began sexually harassing her in the fall of 2011. She

reported the alleged harassment to UNE's Human Resources Department in September 2012. In November 2012, Carlson and UNE's HR Director met with Visich and discussed Carlson's concerns about the alleged harassment.

## A.     Alleged Retaliation

Carlson asserts that following the November 2012 meeting, Visich and UNE took a number of retaliatory actions against her. She claims:

- Visich completed a negative annual review of her for the 2012-2013 academic year.

- Visich led a campaign to remove her as head of the College Bowl team, an extracurricular activity that Carlson brought to UNE.

- The curriculum committee within the ESP Department refused to grant exemptions to course prerequisites for students seeking to take one of her classes, though similar exemptions had been provided in the past.

- She was forced to transfer out of the ESP Department.

- Her course assignments changed so that she no longer taught courses in her specialty of exercise physiology.

- Visich had her biography removed from the ESP Department webpage.

- UNE failed to give her credit in a news release about the research of one of her former students, and also failed to invite her to participate in a sports science initiative, despite her expertise in that field.

- She is no longer advising Exercise Science majors, which interferes with her ability to recruit candidates for research opportunities.

- She was given lower merit-based salary increases as a consequence of her complaints.

I turn to consider each of these allegations in greater depth.

## 1. Annual Review

The annual review that Visich completed for Carlson for the 2012-2013 academic year stated, in part:

> [Carlson's] involvement with the department this year has been fairly minimal . . . . I believe part of [the] reason for this is that she is the only faculty member in the department that is not located in the [ESP building.] . . . [T]here have been a couple of occasions we have spoken about professional conduct as it pertains to interactions with students and other faculty members in the department. . . . [She] has done a very acceptable job in the courses she has taught this past year, and is respected by the students. She has also taken the initiative to bring in speakers . . . . [She] has also promoted student research, which is greatly needed within the department. . . . In regards to the department, I believe this is the area for the greatest improvement, where I hope she will become more involved in promoting program activities.

ECF No. 31-2 at 52-53. Visich asked UNE's HR director to review the evaluation before he submitted it to ensure that it in no way impeded Carlson's ability to obtain tenure. Carlson drafted a rebuttal to the evaluation, which Visich forwarded to the HR department. The committee that reviewed the evaluation and the rebuttal found that Carlson had "adequately stated her case to have the letter revised," and determined that her level of teaching, service, and scholarship "far exceed[ed] 'very acceptable.'" ECF No. 34 at 52-53. Carlson applied for tenure in late 2013. Her application was supported at every level of review, and she was awarded tenure and promoted to Associate Professor in March 2014.

## 2. College Bowl Team

Carlson was a founding faculty member of UNE's student College Bowl team, which participated in extracurricular trivia contests. She led the team from 2009 to

2013. She contends that in October 2013, after some discussion at a department faculty meeting about how the selection process for the team operated, Visich selected another person to run the team. UNE contends that Visich merely promoted the idea that another faculty member should help run the team with Carlson, and that Carlson was welcomed to continue to help run the team, but that she chose to stop participating rather than work with the other faculty member.

### 3. Prerequisite Waiver Requests

In December 2013, a number of students who wished to take Carlson's Environmental Physiology course, but who lacked the prerequisite coursework, applied for waivers of the prerequisites. The waiver applications were reviewed by a curriculum committee, which consisted of department faculty members, and which granted only one of the waiver requests. Carlson asserts that in the past Visich would typically approve such waiver requests, and that this was the first time the requests had been referred to a curriculum committee. Carlson testified that she believed the requests were denied because Visich wanted to encourage students to take one of his own classes instead of her class.

### 4. Transfer from ESP Department

In September 2013, Elizabeth Francis-Connolly became the new dean of the Westbrook College of Health Professionals, the college within UNE in which the ESP Department is located. In January 2014, Carlson met with Francis-Connolly and UNE's HR director to request a surrogate supervisor so that she did not have to work as closely with Visich. Though Francis-Connolly considered the idea, she ultimately

decided that it was not feasible for Carlson to be supervised by a faculty member outside the ESP department while remaining in the department, because that arrangement would likely create a conflict and usurp the leadership of the Department. Francis-Connolly instead proposed that Carlson be moved out of the ESP department, in order to accommodate her request to be separated from Visich. Carlson accepted this proposal with the understanding that it was the only option that would allow her to continue teaching her courses while no longer being supervised by Visich. She moved out of the ESP Department in February 2014. Francis-Connolly served as Carlson's supervisor for a period, and Carlson was eventually placed in the Physical Therapy Department.

### 5. Teaching Assignments

For the 2014-2015 academic year, the year following her move out of the ESP Department, Carlson continued to teach Exercise Physiology, though Visich asked that the course be assigned to another faulty member. In the 2015/2016 academic year, Carlson was not offered the Exercise Physiology or Environmental Physiology courses she had been accustomed to teaching, and instead taught an introductory course. Francis-Connolly explained that the change occurred because Carlson was no longer full-time in the ESP Department, and she was trying to create distance between Carlson and Visich. Visich had also complained that he had no control over the course content when Carlson taught the courses because she was no longer communicating with anyone in the ESP Department. Following a sabbatical during the fall of 2016, Carlson was assigned to teach Environmental Physiology again for

the spring semester in 2017, though the course was listed through the Biology Department, rather than the ESP Department.

In June 2014, UNE removed a dedicated laboratory period from the Exercise Physiology course that Carlson was teaching. Carlson asserts that this change made it difficult for her to conduct the lab that was part of her course. UNE contends that the lab was unnecessary because its topics were already being taught as part of existing courses, and removing the lab allowed the university to avoid hiring adjunct faculty to cover the additional laboratory time.

In May 2015, Carlson and Francis-Connolly discussed cross-listing the Environmental Physiology course with the Biology Department. Carlson claims that Visich then had the Associate Dean remove the cross-listed course from the course catalog. UNE responds that the Associate Dean removed the course because proper procedures were not followed in cross-listing the course. While Visich agreed with the action, he claims he did not request or instruct that the course be removed. The Environmental Physiology course was eventually listed with the Biology Department for the 2016-2017 academic year.

### 6. Removal from Department Webpage

The ESP Department webpage contains links to the biographies of faculty within the department. In July 2015, Visich sent an email to UNE's web editor requesting that Carlson's biography be removed from the ESP webpage because she no longer worked in the Department. Carlson asserts that outside research and funding partners previously found her information through the ESP webpage, and

that she has not been contacted by any funding partners since her biography was removed from the page. Carlson's biography remains accessible through the UNE website, the Westbrook College of Health Professionals webpage, and the Physical Therapy Department webpage.

### 7. News Release and Institute for Sports Science and Human Performance

In October 2016, UNE issued a news release touting the research accomplishments of one of its students. Although Carlson acted as an advisor for the student during the research and was a co-author of the student's paper, she was not mentioned in the article. Carlson asserts that she was thus denied due credit for her role in the research. UNE responds that the article did not identify any faculty member who assisted with the student's research, and only mentioned faculty members who supported students at the conference that was the subject of the article.

In 2017, UNE created the Institute for Sports Science and Human Performance, an initiative to investigate issues in those fields. Carlson was not invited to participate in the initiative, though she had published more articles in these fields than any other faculty member at the Westbrook College of Health Professionals.

### 8. Removal of Advisees

Following her transfer out of the ESP Department, Carlson no longer acted as an advisor for students majoring in Exercise Science. She asserts that no longer acting as an advisor negatively impacts her ability to recruit research assistants, as well as her ability to recruit students for her classes.

### 9. Merit-Based Pay Raises

Each year, every employee of the Westbrook College of Health Professionals is considered for a merit-based salary increase. Part of the annual budget approved by the University's Board of Trustees is allocated to each college for providing these pay raises. Francis-Connolly is notified each year of the total dollar amount available for pay raises, as well as the maximum individual percentage she is allowed to award. During Francis-Connolly's tenure, the highest maximum percentage increase she has been permitted to award is 4%. Francis-Connolly determines pay raises for individual employees based in part on feedback from the employees' supervisors. Pay raises are primarily tied to an employee's performance, but other factors, such as the appropriateness of the employee's current base salary, may be considered. On numerous occasions, Francis-Connolly has elected not to give a pay raise to certain employees.

Carlson received the following pay raises in the years since 2012: 2012 – 2.6%; 2013 – 3.75%; 2014 – 2.5%; 2015 – 8.2% (7% of which was attributable to her promotion and award of tenure); 2016 – 2%; 2017 – 2.2%. Carlson asserts that she received the lowest pay raises of her career in 2016 and 2017 despite the fact that her research and service had substantially increased. She also asserts that her current position within the Physical Therapy Department hampers her ability to earn higher pay raises because she has fewer teaching opportunities.

## II.  LEGAL STANDARD

### A.    Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014).  "A dispute is genuine if 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party.'" *Johnson v. Univ. of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)).  "A fact is material if it has potential to determine the outcome of the litigation." *Id.* (citing *Maymí v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

In determining whether a party moving for summary judgment has met its burden, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007).  Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Id.* (citing *Clifford v. Barnhart,* 449 F.3d 276, 280 (1st Cir. 2006)) (internal quotation marks and emphasis omitted); Fed. R. Civ. P. 56(c).  "[A]s to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to

the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (internal quotation and citation omitted).

**B.     Local Rule 56**

Local Rule 56 defines the evidence that this court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment. First, the moving party must file a statement of material facts that it claims are not in dispute, with each fact presented in a numbered paragraph and supported by a specific citation to the record. *See* Loc. R. 56(b). Second, the non-moving party must submit its own short and concise statement of material facts in which it admits, denies, or qualifies the facts alleged by the moving party, making sure to reference each numbered paragraph of the moving party's statement and to support each denial or qualification with a specific citation to the record. Loc. R. 56(c). The non-moving party may also include its own additional statement of facts that it contends are not in dispute. *Id.* These additional facts must also be presented in a numbered paragraph and be supported by a specific citation to the record. *Id.*

Third, the moving party must then submit a reply statement of material facts in which it admits, denies, or qualifies the non-moving party's additional facts, if any. Loc. R. 56(d). The reply statement must reference each numbered paragraph of the non-moving party's statement of additional facts and each denial or qualification must be supported by a specific citation to the record. *Id.*

The court may disregard any statement of fact that is not supported by a specific citation to the record, Loc. R. 56(f), and the court has "no independent duty

to search or consider any part of the record not specifically referenced in the parties'
separate statement of facts." *Id.*; *see also, e.g., Packgen v. BP Exploration, Inc.,* 754
F.3d 61, 70 (1st Cir. 2014); Fed. R. Civ. P. 56(e)(2).  Properly supported facts that are
contained in a statement of material or additional fact are deemed admitted unless
properly controverted.  Loc. R. 56(f).

## III. DISCUSSION

To establish a prima facie case for retaliation under Title VII, 42 U.S.C. §
2000e-3, or the Maine Human Rights Act, 5 M.R.S. § 4633,[1] Carlson must
demonstrate that: (1) she engaged in protected activity; (2) she suffered an adverse
employment action; and (3) the adverse employment action was causally connected
to the protected activity.  *See Ray v. Ropes & Gray LLP*, 799 F.3d 99, 107 (1st Cir.
2015).  Establishing a prima facie case of retaliation is a "relatively light burden."
*DeCaire v. Mukasey*, 530 F.3d 1, 19 (1st Cir. 2008).  If Carlson establishes her prima
facie case, the claim is then analyzed under the *McDonnell Douglas* burden-shifting
framework.  *See Mariani-Colón v. Dep't of Homeland Sec.*, 511 F.3d 216, 223 (1st Cir.
2007).  Under that framework, the burden shifts to UNE to produce a legitimate, non-
retaliatory justification for the adverse employment action.  *See id.* at 224.  If UNE
does so, the burden shifts back to Carlson, who must show that the proffered
justification is in fact pretextual.  *See id.*

For purposes of its motion, UNE does not dispute that Carlson engaged in
activity protected under Title VII and the Maine Human Rights Act when she

---

[1] Claims under Title VII and the Maine Human Rights Act are analyzed under the same standard.
*See Osher v. Univ. of Me. Sys.*, 703 F. Supp. 2d 51, 64 n.12 (D. Me. 2010).

complained about the alleged sexual harassment. Whether Carlson can establish a prima facie case therefore turns on whether she can show that she was subjected to an adverse employment action, and that the action was causally connected to her sexual harassment complaints. An adverse employment action is one that would dissuade a reasonable worker from making or supporting a charge of discrimination. *Morales-Vallellanes v. Potter*, 605 F.3d 27, 36 (1st Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). To satisfy the causation element, Carlson must show that her harassment complaints were a but-for cause of the alleged adverse action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).[2]

## A.    Alleged Adverse Actions

UNE argues that any alleged adverse employment actions that took place before January 8, 2014 are time-barred and cannot form the basis of Carlson's retaliation claim. Carlson filed her retaliation complaint with the Maine Human Rights Commission and the Equal Employment Opportunity Commission (EEOC) on or about November 4, 2014. *See* ECF No. 41 at 48, ¶ 150. A plaintiff must file a complaint with the Maine Human Rights Commission and the EEOC within 300 days of the alleged discriminatory conduct. 5 M.R.S.A. § 4611 (2017); 42 U.S.C.A. § 2000e-5(e)(1) (2017). "Each discrete discriminatory act starts a new clock for filing charges alleging that act." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). A

---

[2] The Maine Law Court uses the "substantial factor" test to analyze causation under the Maine Human Rights Act, but this test is functionally equivalent to the but-for cause test used under Title VII. *See Caruso v. Jackson Lab.*, 2014 ME 101, ¶ 17, 98 A.3d 221.

negative performance evaluation, transfer to another office, failure to assign work, and a change of supervisor are examples of discrete discriminatory acts. *See Ayala v. Shinseki*, 780 F.3d 52, 57 (1st Cir. 2015). Any discrete acts that occur before the 300-day window are time-barred and are not actionable. *See id.* at 58; *see also Morgan*, 536 U.S. at 113. Acts occurring outside the 300-day window may, however, be used as background evidence in support of a timely claim. *Morgan*, 536 U.S. at 113.

The performance evaluation Carlson received for the 2012-2013 academic year, her removal as head of the College Bowl team, and the curriculum committee's refusal to grant prerequisite exemptions for students who wished to take Carlson's Environmental Physiology class are discrete acts that took place before January 8, 2014, and are therefore outside the 300-day window that preceded the filing of her EEOC and Maine Human Rights Commission complaints. These acts are therefore not actionable as bases for her retaliation claim.

## 1. Transfer from the Exercise and Sport Performance Department

Carlson claims that her transfer from the Exercise and Sport Performance (ESP) Department was an adverse employment action that UNE took in retaliation for her complaints of sexual harassment against Visich. She contends that her removal from the Department prevents her from working in the area of her expertise, and separates her from students who might otherwise serve as her research assistants.

An employee's disadvantageous transfer or assignment may constitute an adverse employment action even if it does not result in a diminution of the employee's salary or a loss of benefits. *See Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 24 (1st Cir. 2002). A significant change in responsibilities or professional opportunities can render even a purely lateral transfer adverse for purposes of the retaliation analysis. *See id.*; *see also Rodriguez v. Bd. of Educ.*, 620 F.2d 362, 366 (2d Cir. 1980) (holding transfer of art teacher from middle to elementary school adverse due to change in responsibility, despite same salary and benefits); *Collins v. Illinois*, 830 F.2d 692, 704 (7th Cir. 1987) (holding transfer of librarian adverse due to lost opportunities and benefits such as listing in professional publications, printed business cards, and access to telephone). Here, however, the record evidence is undisputed that Carlson participated in the decision for her to transfer out of the ESP Department, and that the transfer was voluntary.

In response to Carlson's concerns about Visich, Francis-Connolly gave Carlson the choice to either remain in the ESP Department with Visich as her supervisor, or to transfer to another department. It is undisputed that Carlson "accepted the proposal to remove her from the department because it was the only proposal" that allowed her to avoid working under Visich. ECF No. 43 at 25-26, ¶ 82. Carlson argues, in effect, that her decision was not voluntary because she was forced to choose between two unacceptable alternatives: remaining under Visich's supervision or transferring out of her department. But the fact that the choice given to Carlson was a difficult one, and possibly ill-advised in light of the harassing conduct she alleged

Visich committed, does not render the transfer retaliatory. To the extent that Carlson contends that UNE's response to her complaints about Visich was inadequate or inappropriate, she presents grounds for a claim for sexual harassment, not retaliation. The claims contained in her Complaint, however, are for retaliation. I am therefore constrained to review the record against the standards that govern retaliation claims.

If UNE had maintained the status quo by keeping Carlson in the ESP Department with Visich as her supervisor, it would not be liable for retaliation because doing nothing is not a retaliatory act. *Cf. Burlington N.*, 548 U.S. at 57, 59 (holding that anti-retaliation provision prohibits discriminatory "actions" that injure protected individuals). It follows that giving Carlson the choice to either maintain the status quo, or to make a change if she wished, was not retaliatory. No reasonable employee would be dissuaded from making a charge of discrimination under these circumstances.

Francis-Connolly's decision not to provide Carlson her preferred solution of remaining in the ESP Department but working under a different supervisor was also not retaliatory. "A refusal to grant a change requested by an employee is not an adverse employment action unless the employee has a right to the requested change by law or through the terms and conditions of his employment." *Barrett v. Lucent Tech., Inc.*, 36 Fed. Appx. 835, 842 (6th Cir. 2002). Carlson does not contend that she had a right to the appointment of a new supervisor under either the law in general, or her employment contract in particular.

Carlson has therefore failed to establish that her transfer out of the ESP Department constituted an adverse employment action for purposes of establishing a prima facie case of retaliation.

## 2. Course Assignments

Carlson argues that several of UNE's actions regarding the courses she has been assigned to teach since she made her harassment complaints constitute retaliation. These actions include removing her from teaching Exercise Physiology and Environmental Physiology for the 2015-2016 academic year and instead assigning her to teach an introductory class, as well as terminating her dedicated lab and failing to cross-list the Environmental Physiology course with the Biology Department. UNE responds that changes in Carlson's course assignments cannot constitute adverse employment actions because she was not entitled to teach specific courses, and Francis-Connolly had the discretion to change her teaching assignments based on the University's needs, pursuant to Carlson's employment contract. UNE contends that the mere alteration of Carlson's job duties, as manifested in the courses she was assigned to teach, does not rise to the level of an adverse employment action.

A change in an employee's job duties, even if the new duties are within the employee's job description, can dissuade a reasonable worker from filing a discrimination complaint. As explained by the Supreme Court in *Burlington N.*:

> Almost every job category involves some responsibilities and duties that are less desirable than others. Common sense suggests that one good way to discourage an employee . . . from bringing discrimination charges would be to insist that she spend more time performing the arduous duties and less time performing those that are easier or more agreeable.

16

548 U.S. at 70-71. Accordingly, the changes in Carlson's teaching assignments may constitute an adverse employment action. Carlson has satisfied the adverse action element of her prima facie case with respect to the changes made in her course assignments.

### 3. Removal from Department Webpage

Carlson argues that the removal of her biography from the ESP Department webpage constitutes an adverse employment action because it is now more difficult for outside funding partners to find her and contact her with research opportunities. Although Carlson's primary academic focus is in exercise physiology, her biography is no longer linked to the webpage of the department within UNE that is most closely identified with that topic. A reasonable jury could infer from this evidence that the removal of Carlson's biography limited her professional opportunities, and therefore constituted an adverse action. *Cf. Collins*, 830 F.3d at 704 (refusal to provide librarian with business cards constitutes adverse action).

### 4. Removal of Advisees

After Carlson was transferred out of the ESP Department, UNE's administration informed her advisees that she would no longer be advising Exercise Science majors. Carlson complains that this change, which was not explained to her students, painted her in a negative light. She also contends that her ability to recruit research assistants and students for her classes is compromised by the fact that she no longer acts as an advisor for Exercise Science majors.

Like the removal from the ESP webpage, discussed above, the removal of Carlson's advisees could constitute an adverse action due to the potential negative effects on her professional opportunities. *Cf. Collins*, 830 F.3d at 704. The record on this point, viewed in the light most favorable to Carlson, is sufficient to satisfy her burden with respect to the adverse action element of her prima facie case.

### 5. Merit-Based Pay Raises

Carlson asserts that she was given the two lowest pay raises of her career in 2016 and 2017 in retaliation for her harassment complaints.[3] She asserts that the degree to which she has satisfied the criteria used to evaluate pay raises has substantially increased over time, but that this success has not been properly reflected in her pay raises. Carlson cites a number of her accomplishments since 2015 to support her assertion that she deserved higher pay raises than the raises she received in 2016 and 2017. The record does not, however, contain any basis for comparing those accomplishments with her accomplishments in the preceding years. Without this information, it is not possible to compare the 2016 and 2017 raises with her earlier pay raises and assess whether they constituted adverse employment actions.

Further, Carlson agrees that an employee's pay raises also depend on the overall funding available to the University in a given year, as well as the

---

[3] The record does not support Carlson's assertion that her raises in 2016 and 2017 were the lowest of her career. The raises given to UNE employees each year are limited by the specific dollar amount allocated for that purpose by the University's Board of Trustees. The correct unit for comparing pay raises from one year to the next is therefore the dollar amount of the raise, and not the raise as a percentage of the employee's total compensation. Measured in actual dollars, Carlson's 2.2% raise in 2017 was larger than her 2.6% raise in 2012, and nearly identical to her 2.5% raise in 2014.

appropriateness of an employee's existing base salary. There are no facts in the summary judgment record indicating how Carlson's pay raises compared to the overall amount of funding available for pay raises each year, or to pay raises received by similarly-situated faculty members. Without that information, it cannot be determined whether the fluctuations in Carlson's pay raises were in fact retaliatory, or were simply a product of the different levels of funding made available by the University.

The Court is not bound to accept Carlson's characterization of the pay raises as adverse or retaliatory without an evidentiary basis to support that characterization. *See Torrech-Hernández v. Gen. Elec. Co.*, 519 F.3d 41, 47 n.1 (1st Cir. 2008) (noting that a court is "not obliged to take at face value [a party's] subjective beliefs when they are not factually based and merely constitute conclusory, self-serving statements"). Accordingly, Carlson has not shown, for purposes of her prima facie case, that the size of the pay raises she received constituted an adverse employment action. Similarly, because she has not established that her pay raises were in fact lower than what she deserved, she has not shown that her current position in the Physical Therapy Department limits her ability to earn higher merit raises.

## 6. News Release and Institute for Sports Science and Human Performance

Carlson asserts that UNE's failure to mention her in a news release about one of her students and the failure to invite her to participate in UNE's new Institute for Sports Science and Human Performance constitute adverse employment actions.

UNE objects to the Court's consideration of the news release because the event took place after the filing of the Complaint and before the close of discovery, but was not raised by Carlson through an amended pleading. UNE also objects to consideration of Carlson's exclusion from the Institute because the event took place after the close of discovery, and was not raised by Carlson through an amended pleading.

The news release and the creation of the Institute are both events that took place after the filing of Carlson's Complaint. A motion to supplement under Federal Rule of Civil Procedure 15(d) is the proper mechanism to assert claims based on events occurring after the filing of a complaint. *See* 6A Charles Alan Wright & Arthur R. Miller et al., *Federal Practice and Procedure* § 1504 (3d ed. 2017 Update). Carlson did not make such a motion, nor did she disclose these events or her anticipated reliance on them during discovery. The news release and Carlson's exclusion from the Institute are therefore not properly before the Court on this summary judgment motion.

Even if I were to consider Carlson's allegations regarding the news release and Institute, however, they do not rise to the level of adverse employment actions. The failure to mention Carlson in a news release is an example of the "petty slights or minor annoyances" that the Supreme Court has held do not rise to the level of adverse employment actions. *See Burlington N.*, 548 U.S. at 68 (noting that "Title VII . . . does not set forth a general civility code for the American workplace," and "personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable") (internal quotations omitted); *see also Billings v.*

*Town of Grafton*, 515 F.3d 39, 54 (1st Cir. 2008) (holding that supervisor's "upbraiding" of plaintiff for question asked at a meeting, criticizing her, and becoming "aloof" toward her constituted "petty slights or minor annoyances"); *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 25 (1st Cir. 2002) (holding "extreme supervision," snubbing by supervisors and coworkers, and other forms of "personal animus, hostility, disrespect, and ostracism" do not constitute adverse employment actions).

With respect to the failure to include her in the Institute for Sports Science and Human Performance, Carlson has offered no contextual facts from which a fact-finder could conclude that the bare fact that she was not made part of the Institute rises to the level of an adverse employment action. As previously noted, I am not obliged to accept as fact Carlson's subjective beliefs that are based on nothing more than her own conclusions. *See Torrech-Hernández*, 519 F.3d at 47 n.1.

## B. Causal Connection

The third of the three prima facie elements Carlson must establish is a showing that the alleged adverse employment actions were causally connected to her protected activity. *See Ray*, 799 F.3d at 107. The three discrete acts that satisfy the adverse action element of Carlson's prima facie case—the change in her course assignments, her removal from the ESP webpage, and the removal of her advisees—must be analyzed accordingly.

To establish her prima facie case, Carlson must show that her harassment complaints were a but-for cause of each of the asserted adverse actions. *See Nassar*, 133 S. Ct. at 2534. The record shows, however, that the adverse actions were a

consequence of her transfer out of the ESP Department. While the transfer was related to her sexual harassment complaints, the fact that her transfer was voluntary prevents Carlson's reports of harassment from being a but-for cause of the adverse actions asserted. Carlson was given the choice to remain in the ESP Department if she wished; her decision to accept a transfer out of the department was an intervening cause of the adverse consequences she experienced. Carlson herself acknowledges that the change in her course assignments was made "because she was not 'full-time in the Department' and [she] lost her advisees and was removed from the ESP website because she was no longer in the department." ECF No. 42 at 18 (internal citation omitted). There is no evidence in the record that suggests that Carlson would have lost her classes, her advisees, or her place on the ESP webpage if she had chosen to remain in the ESP Department, despite her sexual harassment complaints.

Because Carlson has not shown a causal connection between the adverse actions she suffered and her sexual harassment complaints—as opposed to her decision to transfer out of the ESP Department—she has not established the third of the three elements of a prima facie case of retaliation.

## C. *McDonnell Douglas* Burden-Shifting Framework

Even if Carlson had succeeded in establishing her prima facie case of retaliation, her claim would nonetheless fail under the *McDonnell Douglas* burden-shifting framework. Under that framework, if UNE satisfies its burden of production to suggest a legitimate, non-discriminatory reason for each adverse action taken,

Carlson bears the ultimate burden of showing that the proffered justifications are in fact pretextual. *See Ray*, 799 F.3d at 113.

### 1. UNE's Non-Discriminatory Reasons

UNE asserts that Francis-Connolly's decision to offer Carlson the option of transferring out of the ESP Department was made in an effort to accommodate Carlson's desire not to work with Visich. UNE further asserts that Francis-Connolly ultimately decided not to accept Carlson's plan of having a surrogate supervisor within the ESP Department because doing so would have usurped the authority of the department's leaders and interfered with the ability of the department's faculty members to work collaboratively.

UNE further asserts that the changes in Carlson's course assignments were prompted by Carlson's desire to have distance from the ESP Department, and by concerns about her ability to work collaboratively with the rest of the ESP faculty. UNE contends that because the curriculum within a given department is integrated, it is important for the faculty to collectively develop and oversee the curriculum. UNE asserts that Carlson refused to communicate with ESP Department leadership, and that allowing her to continue teaching courses within the Department without interacting with or taking direction from other department faculty would have created unnecessary conflicts and difficulties. UNE further asserts that its removal of a dedicated lab from one of Carlson's courses was the result of operational and budgetary limitations. Finally, UNE contends that the Environmental Physiology

course was initially not cross-listed with the Biology Department because the proper protocols for cross-listing courses were not followed.

UNE contends that the decision to remove Carlson's biography from the ESP webpage was based solely on the fact that she was no longer a member of the ESP Department. UNE asserts that only faculty members who belong to a specific department may have their biography linked to that department's webpage. Additionally, UNE claims that the fact that Carlson no longer advises Exercise Science majors is also a consequence of her transfer out of the Department.

UNE's explanations satisfy UNE's burden of producing a non-discriminatory reason or reasons for each of the adverse employment actions alleged by Carlson.

### 2. Evidence of Pretext

In order to show that an employer's justification for an adverse action is pretextual, a plaintiff must produce sufficient evidence to "enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination." *Ray*, 799 F.3d at 113 (quotation omitted).

In an effort to establish that UNE's proffered justifications are pretextual, Carlson points to the facts that UNE had to hire a temporary faculty member to teach the Exercise Physiology class after it was not assigned to her, and that Visich tried to remove Carlson from teaching Exercise Physiology and Environmental Physiology in 2014 and 2015. Carlson also agrees, however, that the changes in her course assignments, her removal from the webpage, and the removal of her advisees were

caused by her transfer out of the ESP Department.  *See* ECF No. 42 at 18.  She does not point to any evidence that UNE's reliance on her transfer as the reason for the alleged adverse actions is pretextual, such as evidence of other faculty members changing departments but nonetheless keeping their teaching assignments, webpage biographies, and advisees.  The fact that UNE hired a temporary faculty member to teach Exercise Physiology after Carlson transferred out of the ESP Department is not evidence of pretext.  To show pretext, Carlson must demonstrate that her transfer was not the real reason behind the change in her teaching assignments, but was instead a pretextual explanation fabricated to mask an unlawful discriminatory motive.  *See Ray*, 799 F.3d at 113.  The fact that UNE accommodated Carlson's transfer and the subsequent change in her teaching assignments by hiring a temporary faculty member does suggest that the transfer was not the real cause of the change in teaching assignments.  Similarly, the fact that Visich asked for Carlson to be removed from teaching Exercise Physiology and Environmental Physiology in 2014 and 2015—a request that was denied by Francis-Connolly—does not demonstrate that the justification for removing her from those classes a year later is pretextual.

The record instead corroborates UNE's proffered justifications.  Although Carlson asserts that she "worked well with most of her fellow faculty members"— citing as evidence only her own declaration, which was prepared after UNE filed its motion for summary judgment—she does not dispute UNE's explanation for why Visich sought to remove her from teaching the Exercise Physiology and

Environmental Physiology classes.  *See* ECF No. 51 at ¶ 93; ECF No. 41 at ¶ 106.

UNE's statement of material facts asserts that:

> In or around the spring of 2015, Dr. Visich spoke with Dean Francis-Connolly about [Carlson] continuing to teach Exercise Physiology and Environmental Physiology.  Dr. Visich told Dean Francis-Connolly that [Carlson] "refuses to communicate with" the directors of the ESP Department and "refuses to teach" things that the directors required her to teach for those courses.  Moreover, Dr. Visich testified that, because of [Carlson]'s failure to communicate with and follow the direction of the directors, he told Dean Francis-Connolly that he, as the head of the department, had "no control over this course anymore in regard to the content."

ECF No. 41 at ¶ 106 (quoting ECF No. 31-2 at 35).  Carlson offered a "qualified" response to this statement, claiming that the lab space she was given was inadequate to perform the required labs.  *Id.*  She did not deny, however, that she refused to communicate with the directors of the ESP Department, or that Visich, as head of the department, had no control over the course content.  *Id.*  Thus, rather than demonstrating that UNE's given justifications are a "sham," *Ray*, 799 F.3d at 113, Carlson admits that those justifications are based in fact.  Further, she points to no facts that suggest that the real motive behind UNE's actions was unlawful discrimination in retaliation for her harassment complaints.  *See id.*  Carlson has therefore failed to meet her burden to generate a question of material fact as to the pretext portion of the *McDonnell Douglas* framework.

## IV.  CONCLUSION

Carlson has failed to establish her prima facie case of retaliation, and has also failed to establish that the legitimate, non-discriminatory reasons offered by UNE for

its actions were in fact pretextual.  UNE is therefore entitled to summary judgment on Counts I and II of Carlson's Complaint.  UNE is accordingly also entitled to summary judgment on Count III of the Complaint, which alleges that UNE is liable for punitive damages.  *See* 42 U.S.C.A. § 1981a(b)(1) (2017) (punitive damages only available where defendant engaged in discrimination with malice or reckless indifference); 5 M.R.S.A. § 4613(2)(B)(8)(c) (2017) (same).  Thus, UNE's Motion for Summary Judgment (ECF No. 35) is **GRANTED**.

**SO ORDERED.**

**Dated this 12th day of July 2017**

**_____/s/ JON D. LEVY_____**
**U.S. DISTRICT JUDGE**